UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
──────────────────────────────

SECURITIES INVESTOR PROTECTION
CORPORATION,

    Plaintiff-Applicant,

  - against -

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

    Defendant.
──────────────────────────────
IN RE BERNARD L. MADOFF,

    Debtor.
──────────────────────────────
IRVING H. PICARD, Trustee for the
Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff
Investment Securities LLC and
Bernard L. Madoff,

   Plaintiff,

  - against -

LISA BETH NISSENBAUM TRUST and
NEAL KURN, in his capacity as
trustee for Lisa Beth Nissenbaum
Trust,

    Defendants.
──────────────────────────────

20 cv. 3140 (JGK)

<u>MEMORANDUM OPINION AND
ORDER</u>

**JOHN G. KOELTL, District Judge:**

  The plaintiff, Irving H. Picard (the "Trustee"), has brought this suit in his capacity as the trustee for the substantively consolidated SIPA liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS" or the "LLC") against the defendants, Lisa Beth Nissenbaum Trust (the "Trust") and Neal

Kurn, in his capacity as trustee for the Trust.[1]  The Trustee has
sought avoidance and recovery of $625,551 transferred from BLMIS
to the defendants in the two years prior to BLMIS's filing for
bankruptcy (the "Two-Year Transfers") pursuant to the Securities
Investor Protection Act of 1970, 15 U.S.C. §§ 78aaa-78lll
("SIPA").  The Trustee has moved for summary judgment holding
the defendants liable to the Trustee for the Two-Year Transfers,
and the defendants have moved for summary judgment dismissing
this case.  For the following reasons, the Trustee's motion is
**granted**, and the defendants' motion is **denied.**

## I.   BACKGROUND

The Trust is a trust formed under the laws of Arizona.
Pl.'s 56.1 Stmt. ¶ 107.  Kurn is a resident of Arizona and a
trustee for the Trust.  Id. ¶ 109.  The Trust was a good faith
customer of BLMIS and held BLMIS Account Number 1EM475 (the
"Nissenbaum Account"), under the name "The Lisa Beth Nissenbaum
Trust c/o Fennemore Craig/Neal Kurn."  Id. ¶ 108.  The Trustee
brings this action to recover the allegedly fictious profits
transferred from BLMIS to the defendants in the two years prior
to BLMIS's filing for bankruptcy.[2]

---

[1] To clarify any ambiguity, at all times in this Memorandum Opinion and Order
"the Trustee" refers to Irving H. Picard as the Trustee for the SIPA
Liquidation of BLMIS, not Neal Kurn, a trustee for the Lisa Beth Nissenbaum
trust.
[2] Contemporaneously with this decision, the Court is issuing an Opinion and
Order in Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC ("JABA"),
20-cv-3836, which considers similar motions for summary judgment in another
case in which the Trustee seeks to recover Two-Year Transfers from a
different group of defendants.  The reasoning in both decisions is

## A. Operation of BLMIS

BLMIS operated as three business units: (1) a proprietary trading business; (2) a market-making business; and (3) the investment-advisory business (the "IA Business").  Dubinsky Decl., Attach. A (the "Dubinsky Report") ¶ 36.  The proprietary trading business traded for its own account to make money for BLMIS.  Id. ¶¶ 36, 46.  The market-making business made markets in certain stocks, bonds, warrants, and rights.  Id.  The IA Business was advertised as trading stocks, equities, and options on behalf of its customer accounts.  Id.  ¶¶ 41-44.  The propriety trading and market-making businesses are collectively referred to as the "Proprietary Trading Business."  All three business units were part of BLMIS and were operated by Bernard L. Madoff.  Id. ¶¶ 36, 48.

BLMIS told its IA Business customers that BLMIS was using investment strategies known as "convertible arbitrage" or "split-strike conversion."  Id. ¶¶ 19-26.  BLMIS did not actually employ either strategy.  Id.  Instead, BLMIS used historical trading information to create false records for the IA Business customers.  Id. Section VI.A(1)(a).  By 1992, BLMIS represented that its primary investment strategy was split-strike conversion, which was the strategy BLMIS claimed to use in connection with the Nissenbaum Account.  Id. ¶ 155.  The

---

substantially the same.  It is repeated in both cases for ease of reference for the parties involved in the separate cases.

purported split-strike conversion strategy involved investing in a basket of common stocks from the Standard & Poor's 100 Index, buying put options and selling call options as a hedge, and purchasing United States Treasury Bills ("T-Bills") where appropriate.  Id. ¶¶ 44, 156-58.

The Trustee's expert, Bruce G. Dubinsky, demonstrated that BLMIS did not actually trade on behalf of its IA Business clients.  Dubinsky presented evidence of (1) fabricated trades; (2) the impossible reported volume of equity trades; (3) the impossible equity and options trades reported outside the daily price range; (4) the low volatility in BLMIS's reported daily trading performance compared to the market; (5) the consistently positive return rates that did not mirror the volatility of the market; (6) a lack of Depository Trust Corporation ("DTC") records to confirm the IA Business equity trades; and (7) a lack of Options Clearing Corporation ("OCC") records to confirm the IA Business options trades.  Id. Section VI.A(1)(c)-(f).  The Dubinsky Report shows that there were many instances where the volume that BLMIS claimed to have traded on behalf of its IA Business customers exceeded the volume of equities traded for the entire market.  Id. ¶¶ 159-60.  Moreover, Dubinsky demonstrated that the actual equity trades recorded in BLMIS's DTC account were traded by the Proprietary Trading Business, and that no IA Business trades were cleared through BLMIS's DTC

4

account.  Id. ¶¶ 209-13.  Likewise, Dubinsky demonstrated that
BLMIS's OCC account revealed that BLMIS did not conduct any
options trading for its IA Business customers.  Id. ¶ 222.

Dubinsky's analysis also demonstrated that no customer
funds were invested in T-Bills for the benefit of the customer.
Id. ¶¶ 224-27.  Based on maturity dates, purchase and sale
dates, and volume, Dubinsky determined that all of the T-Bills
held by BLMIS were different from the T-Bills purportedly held
by the IA Business accounts.  Id. ¶¶ 232-40.  T-Bills were
purchased to obtain interest on the customer cash that BLMIS was
holding, but those purchases did not match the T-Bills
transactions that appeared on periodic customer statements that
BLMIS provided to its customers.  Id. ¶¶ 224-28.

Corroborating Dubinsky's analysis, Frank DiPascali, a now-
deceased BLMIS employee, testified in the criminal trial of
Daniel Bonventre, BLMIS's operations manager, that T-Bills
purchased with IA Business money were purchased for the sake of
BLMIS's own cash management strategy and were not purchased for
any customer account.  Cremona Decl. Ex. 3 at 4931.  Several
other former BLMIS employees testified or allocuted to facts
establishing that BLMIS falsified records and inflated revenue.
Pl.'s 56.1 Stmt. ¶¶ 100-06.

In the 10 years prior to BLMIS's collapse, the IA Business
primarily used three bank accounts:  JPMorgan Chase Bank, N.A.

5

("JPMorgan") account #xxxxx1703 (the "703 Account"); JPMorgan
account #xxxxxxxxx1509 (the "509 Account", together with the 703
Account, the "JPMorgan Accounts")); and Bankers Trust account
#xx-xx0-599 (the "BT Account").  Collura Decl., Attach. A (the
"Collura Report") ¶ 17.  BLMIS comingled the IA Business
customers' cash deposits in the 703 Account.  Id. ¶¶ 20-24.  The
JPMorgan Accounts were linked commercial business accounts and
the 509 Account was funded entirely by the 703 Account.   Id.
¶ 25.  IA Business customer withdrawals were made from checking
accounts funded entirely by the 703 Account, typically from the
509 Account or the BT Account.  Id. ¶¶ 25-30.  About 97% of all
cash additions into the 703 Account came from IA Business
customers.  Id. ¶ 24; Dubinsky Report ¶ 340 & n.285.  The
remaining 3% of the cash additions into the 703 Account was from
income earned on short-term investment activity made directly
from the 703 Account, transfers from other BLMIS or Madoff
accounts, and investments of BLMIS customer funds held in the
name of BLMIS or Madoff.  Collura Report ¶¶ 24, 45-62; Dubinsky
Report Figure 52 & n.286.  There were no inflows or outflows
from the 703 Account due to purchasing or selling securities for
customer accounts.  Collura Report ¶¶ 24, 32; Dubinsky Report
¶¶ 340, 350.  Apart from two short-term loans from JPMorgan in
2005 and 2006, both of which were repaid by June 2006, the IA
Business did not obtain loans from third parties or from the

Proprietary Trading Business sufficient to pay the IA Business customer withdrawals.  Dubinsky Report ¶¶ 342-44.

According to customer statements, the IA Business reported receiving cash dividends related to purported equity holdings and paid or credited them to the accountholders.  Id. ¶¶ 247-55. Of the over 8,300 IA Business dividend transactions identified on customer account statements between 1998 to 2008, not one of them matched to a cash addition to the 703 Account, and there is no record of any dividend being received by the IA Business. Id. ¶¶ 248, 253-55.  BLMIS falsely reported paying or crediting its customers with $4.3 billion in cash dividends during that period.  Id. ¶¶ 247-55.

When IA Business customers sent Madoff money to purchase securities, Madoff did not reserve it, but rather comingled it into the 703 Account.  Id. ¶ 340; Collura Report ¶¶ 20-24. Customer redemptions were paid with cash that other customers had deposited into the 703 Account.  Dubinsky Report ¶¶ 330-37. Because the IA Business did not have any legitimate income-producing activities, the only source of cash available to pay purported profits to customers was from cash that other IA Business customers deposited into the 703 Account.  Id.  By 2002, BLMIS was insolvent, with approximately $1.82 billion in assets and $11.9 billion in liabilities.  Id. ¶¶ 432-33.  In December 2008, customer redemptions and withdrawal requests far

exceeded the amount of capital BLMIS had on hand.  Id. ¶¶ 40, 440-41.

### B. BLMIS's Change in Organization

Madoff operated his business from 1960 to 2008.  In 1960, Madoff was assigned Registrant Number 8-8132 from the Securities and Exchange Commission ("SEC") as a broker-dealer.  Cremona Decl. Ex. 1, SEC Form BD.  When SIPA was enacted in 1970, Madoff's business became a member of the Securities Investor Protection Corporation ("SIPC") by virtue of its previous registration with the SEC as a broker-dealer.  Pl.'s 56.1 Stmt. ¶ 7; see also 15 U.S.C. § 78ccc(a)(2)(A).  In 2001, Madoff reorganized his business from a sole proprietorship to a single member LLC under the name "Bernard L. Madoff Investment Securities LLC."  Pl.'s 56.1 Stmt. ¶¶ 7-8.  Madoff previously operated his business under the names "Bernard L. Madoff" and "Bernard L. Madoff Investment Securities."  Id.  When Madoff reorganized the form of his broker-dealer business from a sole proprietorship to an LLC, he filed an Amended Form BD to reflect the change, using the same SEC registrant number, 8-8132, but he did not file a new application for SEC registration.  Cremona Decl. Ex. 2, SEC Amended Form BD.  On the Amended Form BD, Madoff attested that "[e]ffective January 1, 2001, predecessor will transfer to successor all of predecessor's assets and liabilities related to predecessor's business.  The transfer

will not result in any change in ownership or control" and that
no "accounts, funds, or securities of customers of the applicant
are held or maintained by such other person, firm, or
organization."  Id. at 6, 11.  However, where the Amended Form
BD asks the applicant to check all the applicable types of
business of the LLC, the form was completed with checks
corresponding to BLMIS's market-making and proprietary trading
activities, but not next to a box corresponding to investment
advisory services.  Id. at 8-9.

While BLMIS changed from a sole proprietorship to an LLC,
many aspects of the business remained the same.  Customer
property was deposited into the same JPMorgan Accounts when
BLMIS operated as an LLC as happened when BLMIS operated as a
sole proprietorship.  Dubinsky Report ¶ 340; Collura Report
¶¶ 20-24.  The customers of the sole proprietorship became the
customers of the LLC.  Cremona Decl. Ex. 2, SEC Amended Form BD,
at 11.  When reorganizing the sole proprietorship into an LLC,
Madoff expressly identified the transition as an amendment to an
existing registration, not a new application for a separate
broker-dealer.  Id. at 2.  The SEC registration number of BLMIS
remained the same.  Cremona Decl. Exs. 1-2.  And Madoff reported
to the SEC that he transferred all assets and liabilities from
the sole proprietorship to the LLC.  Cremona Decl. Ex. 2, SEC
Amended Form BD, at 11.

### C. Substantive Consolidation

Madoff was arrested on December 11, 2008 for violating federal securities laws.  Pl.'s 56.1 Stmt. ¶ 1.  In a plea allocution, Madoff admitted under oath that BLMIS operated the IA Business as a Ponzi scheme in that he did not execute trades on behalf of his IA Business clients.  Cremona Decl. Ex. 5, at 23-24.  Madoff stated that he never invested client funds in securities, and he explained that he created false trading confirmations and client account statements.  Id. at 26-27. When a client sought to redeem principal or receive profits from their account, Madoff used funds from a JPMorgan account that contained funds from the investor and other investors to pay the requested funds.  Id. at 23.

In December 2008, SIPC sought a protective decree under Section 78eee, naming the member broker-dealer registered with the SEC under Registrant Number 8-8132.  See Application of SIPC ¶ 2, SEC v. Madoff, No. 08-cv-10791 (S.D.N.Y. Dec. 15, 2008), ECF No. 5.  The court entered the protective decree and appointed the Trustee for the liquidation of the "business of the Defendant."  Order ¶ 2, SEC v. Madoff, No. 08-cv-10791 (S.D.N.Y. Dec. 15, 2008), ECF No. 4.  The court also ordered that Madoff's creditors could initiate an involuntary bankruptcy proceeding against Madoff so that a Chapter 7 trustee could target "that portion of Mr. Madoff's property that is neither

forfeitable criminally nor subject to the liquidation of BLMIS under SIPA."  Order at 3-4, <u>SEC v. Madoff</u>, No. 08-cv-10791 (S.D.N.Y. Apr. 10, 2009), ECF No. 47.

The Trustee brought this proceeding on November 12, 2010 seeking to recover the Two-Year Transfers and fictious profits received by the defendants during the six years prior to the liquidation.  Compl. ¶ 2.  Previously, the SIPA Trustee moved to substantively consolidate the SIPA liquidation and the Chapter 7 bankruptcy.  The Chapter 7 trustee consented and the two trustees established a protocol incorporated into the bankruptcy court's order substantively consolidating the BLMIS and Bernard L. Madoff estates.  <u>See</u> Order ¶ 3, <u>Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC</u>, Adv. Pro. No. 08-01789 (Bankr. S.D.N.Y. June 10, 2009), ECF No. 252 (the "Substantive Consolidation Order").  The Substantive Consolidation Order merged the Chapter 7 personal estate of Madoff into the BLMIS SIPA proceeding <u>nunc pro tunc</u>.  <u>Id.</u> ¶ 14.  The Substantive Consolidation Order also preserved the SIPA Trustee's authority to avoid and recover fraudulent transfers of customer property, while the Chapter 7 Trustee had the authority to pursue recovery of Madoff's non-customer property.  <u>Id.</u> ¶¶ 4, 7.  After filing the complaint in this case, the Court of Appeals for the Second Circuit ruled that the Trustee is limited to recovery of the Two-Year Transfers.  <u>See</u> <u>Sec. Inv. Prot. Corp. v. Bernard L.</u>

Madoff Inv. Sec. LLC ("Ida Fishman"), 773 F.3d 411, 423 (2d Cir. 2014).

After discovery and mediation, the defendants moved to withdraw the reference of this case to the bankruptcy court, and the plaintiff and the defendants now move for summary judgment regarding the Trustee's claim to recover the Two-Year Transfers.

### D. Transfers to the Nissenbaum Account

The Nissenbaum Account was opened on February 28, 2005 with an inter-account transfer from BLMIS Account 1EM246 of $472,004. Greenblatt Decl., Attach. B. ¶ 25. Account 1EM246 belonged to Lisa Beth Nissenbaum's mother, and the transfer happened after Nissenbaum's mother died. Chaitman Decl. Ex. Y. However, there was no principal balance in the BLMIS Account 1EM246, and therefore the Nissenbaum Account was opened with a zero principal balance. Greenblatt Decl., Attach. B. ¶ 25. Between November 6, 2007 and September 24, 2008, the Nissenbaum Account reflected two cash withdrawals totaling $625,551. Id. ¶ 28. According to Greenblatt's calculation all of this was fictious profit because it was all in excess of principal, which was zero. Id. ¶¶ 28-29. The principal of the Nissenbaum Account never exceeded zero dollars. Id. ¶ 27. Therefore, the Two-Year Transfers totaled $625,551 of fictious profits. Id. ¶¶ 28-29. Greenblatt, the Trustee's expert, used the Inter-Account Method to make his calculations. See Greenblatt Decl., Attach. A ¶¶ 4-

5.  As of November 30, 2006, the Nissenbaum Account purportedly held securities valuing $566,718.26.  Chaitman Decl. Ex. AO. The defendants do not dispute the date, receipt, or amount of the Two-Year Transfers.

The inter-account transfers were deposited into the 703 Account, and the defendants received withdrawals from the 509 Account.  The deposits to the 703 Account bore an endorsement that read "For deposit only Bernard L. Madoff."  Chaitman Decl. Ex. Q.  The checks to the defendants from the 509 Account were in the name Bernard L. Madoff.  Chaitman Decl. Exs. M, T.  The "LLC" designation did not appear on the 509 Account Statements or the 703 Account Statements.  Chaitman Decl. Exs. M, N.

## II.

### A.

The standard for granting summary judgment is well established.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994). [3]  "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are

---

[3] Unless otherwise noted, this Memorandum Opinion and Order omits all alterations, citations, footnotes, emphasis, and internal quotation marks in quoted text.

13

any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.  The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); see also Gallo, 22 F.3d at 1223.  Summary judgment is improper if any evidence in the record from any source would enable a reasonable inference to be drawn in favor of the nonmoving party.  See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).  If the moving party meets its burden, the nonmoving party must produce evidence in the record showing the existence of a genuine issue of material fact and "may not rely simply on conclusory statements or on contentions that the affidavits

14

supporting the motion are not credible." <u>Ying Jing Gan v. City of New York</u>, 996 F.2d 522, 532 (2d Cir. 1993).

## B. SIPA

SIPA created a program to protect property placed with a broker-dealer for the purchase of securities where the customer retained title in such property.  SIPA established SIPC, a nonprofit corporation to which most broker-dealers must belong.  <u>See</u> 15 U.S.C. § 78ccc.  SIPC protects customers of broker-dealers when a member of SIPC fails; SIPC can authorize the commencement of a SIPA litigation, in the form of a liquidation proceeding applicable only to SIPC member firms.  <u>See id.</u> § 78fff; <u>Sec. Exch. Comm'n v. F.O. Baroff Co.</u>, 497 F.2d 280, 281 (2d Cir. 1974).

SIPC selects a trustee to liquidate the failed member firm and any assets belonging to the member firm to recover customer property wrongfully transferred or unlawfully converted by the member firm.  15 U.S.C. §§ 78lll(4), 78fff-2(c)(3).  The proceeds from this liquidation form the corpus of customer property, from which the trustee makes ratable distributions to customers of the customers' share of customer property.  <u>Id.</u> § 78fff-2(c)(1).  SIPA prioritizes customer property over the general bankruptcy estate of the broker-dealer.  <u>See id.</u>; <u>In re Bernard L. Madoff Inv. Sec. LLC</u>, 654 F.3d 229, 233 (2d Cir. 2011) (the "<u>Net Equity Decision</u>") ("In a SIPA liquidation, a

fund of customer property, separate from the general estate of the failed broker-dealer, is established for priority distribution exclusively among customers.").

"Customer property" refers to property held by a broker-dealer but with title belonging to the broker-dealer's customers.  15 U.S.C. § 78lll(4).  SEC Rule 15c3-3 requires broker-dealers to safeguard customers' securities and cash in a reserve fund.  17 C.F.R. § 240.15c3-3.  Customer property includes cash and securities held under Rule 15c3-3, assets derived from or traceable to customer property, and other debtor property that a trustee must allocate to the fund of customer property as necessary to ensure compliance with Rule 15c3-3.  15 U.S.C. § 78lll(4).  Customer property continues to be subject to the protections offered by SIPA even if unlawfully converted or transferred by the insolvent broker-dealer.  Id.  Because customer property is not property of the debtor, it is outside of the purview of the Bankruptcy Code's provisions for avoidance and recovery of transfers.  See id. § 78lll(4); see also Picard v. Fairfield Greenwich Ltd., 762 F.3d 199, 212-13 (2d Cir. 2014).  However, a SIPA liquidation trustee, as specified by SIPC, has standing to recover customer property as if it were property of the debtor in an ordinary bankruptcy.  Id. § 78fff-2(c)(3); see also Fairfield Greenwich Ltd., 762 F.3d at 213. The trustee is authorized to "recover any property transferred

16

by the debtor which, except for such transfer, would have been customer property." 15 U.S.C. § 78fff-2(c)(3).

With certain exceptions not relevant in this case, "all persons registered as broker-dealers" with the SEC under 15 U.S.C. § 78o(b) are "members" of SIPC. Id. § 78ccc(a)(2)(A). Pursuant to Section 78o(b), broker-dealers apply for SEC registration on SEC Form BD. See id. §§ 78o(a)-(b); 17 C.F.R. § 249.501(a). After registering with the SEC, a broker-dealer is assigned a registrant number, at which point the broker-dealer becomes a member of SIPC and is required to contribute to the SIPC fund through annual assessments. See 15 U.S.C. § 78ddd(c)(2). A successor that continues the business of a broker-dealer previously registered with the SEC but changes the predecessor's form of organization must file a Form BD Amendment. SEC Rule 15b1-3(b), 17 C.F.R. § 240.15b1-3(b). The successor entity continues to be the same member of SIPC unless the successor ceases to do business as a broker-dealer and withdraws its registration from the SEC by completing an SEC Form BDW. See SEC Rule 15b6-1, 17 C.F.R. § 240.15b6-1(b).

When SIPC determines that one of its members failed or is in danger of failing to meet its obligations to customers, SIPC applies for a customer protective decree in a district court, at which point the court acquires jurisdiction over the broker-dealer and its property. 15 U.S.C. § 78eee(b)(2)(A). The

protective decree places the SIPC member in liquidation and SIPC specifies a trustee to liquidate the business of the member. Id. § 78eee(b)(3).  The liquidation is then removed to bankruptcy court.  Id. § 78eee(b)(4).

SIPA and the Bankruptcy Code differ on the definition of "debtor."  Under SIPA, a "debtor" is "a member of SIPC with respect to whom an application for a protective decree has been filed under section 78eee(a)(3) of this title."  Id. § 78lll(5). Under the Bankruptcy Code, a "debtor" can be "only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality" where a "person" is defined generally as an "individual, partnership, [or] corporation."  11 U.S.C. §§ 109(a), 101(41).  Unlike the Bankruptcy Code, which tethers the definition of "debtor" to being a "person," SIPA tethers the definition of "debtor" to being a "member" of SIPC.

### III. Admissibility

The defendants contend that Trustee's motion rests on inadmissible evidence, in particular, the expert reports, BLMIS books and records, trial testimony, and plea allocutions.  "[I]t is axiomatic that, when reviewing a summary judgment determination, [a court] may only consider admissible evidence." Bellamy v. City of New York, 914 F.3d 727, 750 (2d Cir. 2019); see also Fed. R. Civ. P. 56(c)(2).  The form of evidence

supporting a motion for summary judgment need not itself be admissible at trial.  After all, affidavits are plainly to be considered on a motion for summary judgment, see Fed. R. Civ. P. 56(c)(4), although they would be inadmissible hearsay if offered at trial.  But the affidavits must set out facts that would be admissible as evidence at trial and show that the affiant or declarant is competent to testify on the matters stated.  Id. So too with expert reports.  While expert reports would be inadmissible hearsay at trial, if the opinions of the experts would be admissible at trial, expert reports can show that there is admissible evidence for trial.  See id.; Raskin v. Wyatt Co., 125 F.3d 55, 66-67 (2d Cir. 1997); Bee v. Novartis Pharm. Corp., 18 F. Supp. 3d 268, 299 (E.D.N.Y. 2014).

The defendants first argue that the Trustee's expert reports are inadmissible because they are based on BLMIS books and records, which are permeated with fraud.  Courts frequently consider expert reports in ruling on summary judgment motions. See, e.g., Olin Corp. v. Lamorak Ins. Co., 332 F. Supp. 3d 818, 838 (S.D.N.Y. 2018) ("The summary judgment standard requires a court to consider all relevant, admissible evidence, and there can be no question that expert opinions, as a general matter, are admissible so long as they meet the criteria set forth in Federal Rule of Evidence 702.").  The defendants have not argued that the reports do not meet the requirement of Federal Rule of

Evidence 702, and it is plain that the reports help the trier of fact to understand the evidence, are based on sufficient data, are based on reliable principles and methods, and that the experts have reliably applied the principles and methods to the facts of the case. See Fed. R. Evid. 702. Expert reports are particularly useful when, as in this case, "a party opposing summary judgment fails to present evidence sufficient to make an issue of an expert's conclusion—such as contrary opinion evidence or evidence tending to undermine the expert's credibility or qualifications—and when the trier of fact would not be at liberty to disregard arbitrarily the unequivocal, uncontradicted, and unimpeached testimony of an expert . . . ." Rivera v. Home Depot USA, Inc., 776 F. App'x 4, 7-8 (2d Cir. 2019).

The defendants claim that BLMIS books and records are not admissible pursuant to the hearsay exception for records of a regularly conducted activity because they are permeated with fraud. See Fed. R. Evid. 803(6). Under the books and records exception to the hearsay rule, a "record of an act, event, condition, opinion, or diagnosis" is not inadmissible hearsay if (A) "the record was made at or near the time by—or from information transmitted by—someone with knowledge"; (B) "the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or

not for profit"; (C) "making the record was a regular practice of that activity"; (D) "all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification"; and (E) "the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Id. With respect to the BLMIS records, there is no dispute that the records were made at or near the time of the relevant events and recorded by someone with knowledge, the records were kept in the regular course of business, and making the records was a regular practice.

The defendants' only attack on the books and records is that they lack trustworthiness because the records were permeated with fraud. If the defendants' argument were true, a case involving fraud would never benefit from expert testimony about the alleged fraud because the records at issue were fraudulent. But a discerning review of the records, particularly when supported by bank statements, can show the details of money that was received by an enterprise and money that was distributed, even if aspects of the records—such as securities that were listed but not purchased—were false. "Rule 803(6) favors the admission of evidence rather than its exclusion if it has any probative value at all." United

States v. Kaiser, 609 F.3d 556, 574 (2d Cir. 2010).  In fact,
business records of entities engaged in fraud are commonly
admitted into evidence.  See, e.g., id. at 575-76 & n.6 (finding
fraudulent activity did not preclude admissibility under
business records exception); Official Comm. Of Unsecured
Creditors of Enron Corp. v. Martin (In re Enron Creditors
Recovery Corp.), 376 B.R. 442, 454-58 (Bankr. S.D.N.Y. 2007)
(admitting debtor's records under business records exception
even though Enron was engaged in fraudulent financial
transactions); In re Adelphia Commc'ns Corp., No. 02-41729, 2006
WL 346418, at *1 (Bankr. S.D.N.Y. Feb. 6, 2006) (admitting
debtors' books and records as business records under Rule 803
even though principals engaged in bank fraud, securities fraud,
and conspiracy through debtor).  "Residual doubts on the
question [of trustworthiness] would go to the weight of the
evidence, not its admissibility."  United States v. Reyes, 157
F.3d 949, 953 (2d Cir. 1998).  The very books and records at
issue in this case have been admitted into evidence several
times in this liquidation.  See, e.g., Sec. Inv. Prot. Corp. v.
Bernard L. Madoff Inv. Sec. LLC ("Nelson"), 610 B.R. 197, 223-24
(Bankr. S.D.N.Y. 2019) (finding BLMIS books and records offered
by the Trustee admissible); Sec. Inv. Prot. Corp. v. Bernard L.
Madoff Inv. Sec. LLC (In re Bernard L. Madoff), 592 B.R. 513,
527-29 (Bankr. S.D.N.Y. 2018) (same), aff'd sub nom. In re

22

Bernard L. Madoff Inv. Sec., LLC, 605 B.R. 570 (S.D.N.Y. 2019),
aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC, 830 F.
App'x 669 (2d Cir. 2020); In re Bernard L. Madoff Inv. Sec. LLC,
605 B.R. 570, 584-87 (S.D.N.Y. 2019), aff'd sub nom. In re
Bernard L. Madoff Inv. Sec. LLC, 830 F. App'x 669 (2d Cir. 2020)
(affirming admissibility on appeal).

Accordingly, the expert reports and the underlying BLMIS
books and records are appropriate to consider in deciding these
cross motions for summary judgment.

The defendants next argue that the plea allocutions and
trial testimony are inadmissible.  DiPascali testified in
Bonventre's criminal trial, but he passed away before the
defendants had an opportunity to depose him.  Pursuant to
Federal Rule of Evidence 807, a hearsay statement is not
excluded by the rule against hearsay if "the statement is
supported by sufficient guarantees of trustworthiness" and "it
is more probative on the point for which it is offered than any
other evidence that the proponent can obtain through reasonable
efforts."  Fed. R. Evid. 807.  The law in this Circuit requires
that hearsay admitted pursuant to Rule 807 meet five
requirements: "trustworthiness, materiality, probative
importance, the interests of justice and notice."  Parsons v.
Honeywell, Inc., 929 F.2d 901, 907 (2d Cir. 1991).  There is no

dispute about materiality, probative importance, or notice.  The defendants contest trustworthiness.

When considering trustworthiness in the context of former testimony being considered pursuant to the residual hearsay exception, courts consider factors including:

> (1) the character of the witness for truthfulness and honesty; (2) whether the testimony was given voluntarily, under oath, subject to cross-examination, and a penalty for perjury; (3) the witness's relationship with both the defendant and the government; (4) the witness's motivation to testify; (5) whether the witness ever recanted the testimony; (6) the existence of corroborating evidence; and (7) the reasons for the witness's unavailability.

Nelson, 610 B.R. at 229.

While DiPascali was convicted for fraud and he gave his testimony prior to being sentenced, he testified in person for 16 days under oath and was subjected to cross-examination. There is no evidence that DiPascali later recanted his testimony, and his unavailability is due to his death, not to any fact that would suggest unreliability of his past testimony. Significantly, there is considerable corroborating evidence in the Dubinsky and Collura Reports.  The bankruptcy court considered this very issue and came to the same conclusion.  See id. at 229-30.  Accordingly, on balance, and in the interests of justice, the testimony is sufficiently reliable to be admitted under Rule 807.[4]

---

[4] The defendants also argue that the testimony would not be admissible under the hearsay exception in Federal Rule of Evidence 804(b)(1).  That issue is

The various plea allocutions are admissible under Federal Rules of Evidence 803(22) and 807, as several courts considering this issue in similar contexts have held. See, e.g., id. at 209 ("Criminal plea allocutions are admissible under the exceptions to the hearsay rule set forth in FED. R. EVID. 803(22) for a judgment of a previous conviction and FED. R. EVID. 807's residual exception to hearsay."); Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC ("Legacy Capital Ltd."), 603 B.R. 682, 689-90 & n.8 (Bankr. S.D.N.Y. 2019) (collecting cases) ("The Court may rely on a plea allocution as evidence to support a fact."). The relevant portions of the allocutions concerned whether BLMIS was conducting fraud, a fact that was essential to the judgment in those criminal cases. See Fed. R. Evid. 803(22)(C). Moreover, due to the "sufficient guarantees of trustworthiness" of plea allocutions, when a defendant is admitting facts against the defendant's own penal interest under oath, the allocutions also would be admissible under the residual hearsay exception. See Fed. R. Evid. 807.

## IV. Standing

The defendants argue that the Trustee lacks Article III standing because the IA Business was not part of the LLC, and therefore the Trustee did not suffer an injury. Article III of

---

moot because the testimony is admissible pursuant to Rule 807. See, e.g., Nelson, 610 B.R. at 227-30 (concluding that DiPascali's testimony would not be admissible pursuant to Rule 804(b)(1) alone, but that the testimony was admissible pursuant to Rule 807).

the United States Constitution limits the jurisdiction of
federal courts to "Cases" and "Controversies."  See Lujan v.
Defs. of Wildlife, 504 U.S. 555, 559 (1992).  To satisfy the
requirements of Article III standing, a plaintiff must show that
(1) the plaintiff has suffered an actual or imminent injury in
fact, which is concrete and particularized; (2) there is a
causal connection between the injury and defendant's actions;
and (3) it is likely that a favorable decision in the case will
redress the injury.  See id. at 560-61.  "The party invoking
federal jurisdiction bears the burden of establishing these
elements."  Id. at 561; see also Springer v. U.S. Bank Nat'l
Ass'n, No. 15-cv-1107, 2015 WL 9462083, at *3 (S.D.N.Y. Dec. 23,
2015).  The defendants concede that the Trustee has standing to
recover funds transferred by the LLC, but the defendants argue
that the JPMorgan Accounts and the IA Business were not property
of the LLC, and therefore the Trustee lacks standing to recover
the transfers at issue in this case because the Trustee did not
suffer an injury.

SIPA authorizes the Trustee to recover customer property
transferred by the debtor using the avoidance and recovery
provisions of the Bankruptcy Code.  15 U.S.C. § 78fff-2(c)(3).
The defendants contend that the relevant bank accounts were
owned by Madoff personally, not by the LLC.  Courts that have
considered this issue have concluded that the accounts at issue

contained investor funds for the LLC and not for Madoff personally, meaning that the Trustee has suffered sufficient injury to bring the avoidance and recovery action.  See, e.g., Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC ("Bam II"), 624 B.R. 55, 61 (Bankr. S.D.N.Y. 2020) ("[A]ll of the assets and liabilities of the sole proprietorship, including the IA Business, were transferred to BLMIS via the 2001 SEC Amended Form BD.  As such, the Defendants [sic] customer accounts and the Bank Accounts are property of BLMIS and the monies paid to Defendants from those Bank Accounts must be turned over to the [SIPA] Trustee."); Nelson, 610 B.R. at 217 ("[A]ll of the bank accounts in which the customer funds were held were transferred to BLMIS, and Madoff informed the SEC that he did not retain them regardless of what he told Chase.").

Moreover, the evidence in this case also demonstrates that there is no dispute of material fact that the accounts were used as part of the LLC and not for Madoff personally.  Madoff was using the accounts at issue in his capacity as a sole proprietor until he reorganized his business as an LLC.  When Madoff changed the form of his business from a sole proprietorship to an LLC, the business retained the same SEC registration number. When submitting the Amended Form BD, Madoff noted that the LLC "will transfer to successor all of predecessor's assets and liabilities related to predecessor's business.  The transfer

27

will not result in any change in ownership or control." Cremona
Decl. Ex. 2, SEC Amended Form BD, at 11. And there were no
assets or liabilities of the sole proprietorship listed as "not
assumed by the successor." Id. at 10-11. The form also
indicated that no "accounts, funds, or securities of customers
of the applicant are held by or maintained by [any] other
person, firm, or organization." Id. at 6.

The defendants did not present any expert testimony to
support their proposition that the JPMorgan Accounts were owned
by Madoff personally instead of by the LLC. Rather, the
defendants rely on the fact that on the Amended Form BD, Madoff
did not check a box listing that the LLC would operate an
investment advisory business, and that the account statements
and checks to the defendants listed "Bernard L. Madoff" or
"Bernard L. Madoff Investment Securities" without listing "LLC."
The Dubinsky Report explains that the fact that Madoff did not
check a box listing investment advisory services as a business
of the LLC is not dispositive of the question of ownership of
the JPMorgan accounts, and that the Amended Form BD made clear
that all assets previously owned by the sole proprietorship,
including the JPMorgan Accounts, were transferred to the LLC.
See Bam II, 624 B.R. at 59-61. Furthermore, "forms filled out
improperly [and] business names used interchangeably on bank
accounts and checks[]are the sleights of hand that one would

28

expect to see when exhuming the remnants of a Ponzi scheme."
Id. at 60.

The defendants also rely on Avellino for the proposition
that "[o]nly the Madoff trustee [Alan Nisselson] can recover
actual transfers by the sole proprietorship."  In re Bernard L.
Madoff Inv. Sec. LLC ("Avellino"), 557 B.R. 89, 110 (Bankr.
S.D.N.Y. 2016), reconsideration denied, 2016 WL 6088136 (Bankr.
S.D.N.Y. Oct. 18, 2016).  The defendants argue that Avellino
compels the result that the Trustee does not have standing to
bring this suit.  However, the court in Avellino held only that
the Trustee could not recover transfers prior to 2001, before
BLMIS reorganized as an LLC.  See id. at 108-09; see also Sec.
Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC ("Epstein"),
No. 10-4438, ECF No. 155, at 6-7 (Bankr. S.D.N.Y. Jan. 27, 2021)
("Defendants rely on the Court's holding in Avellino to asset
[sic] that the Trustee lacks standing.  Such reliance is
misplaced.  In Avellino, the Court found that the Trustee lacked
standing to recover "pre-2001" transfers.  Here, the Trustee is
only seeking to recover transfers made after 2001.").  In this
case, the Trustee seeks to recover only the Two-Year Transfers,
and the bankruptcy court has already ruled that the Trustee may
avoid and recover these transfers against similarly situated
defendants.  See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv.

Sec. LLC, 531 B.R. 439, 485-86 (Bankr. S.D.N.Y. 2015) ("Omnibus Good Faith Decision").

Accordingly, the Trustee has standing to bring this avoidance and recovery action because the IA Business and the JPMorgan Accounts were property of the LLC.

## V.    Fraudulent Transfer

When a corpus of customer property is insufficient to pay customer claims, a SIPA trustee may recover certain transfers by the debtor.  15 U.S.C. § 78fff-2(c)(3).  In this case, the customer property the Trustee has recovered is insufficient to pay all customers.  Therefore, pursuant to 11 U.S.C. § 548(a)(1)(A), the Trustee may avoid and recover transfers of fictious profits where (1) a transfer of an interest of the debtor in property (2) was made within two years of the bankruptcy petition date, (3) and the transfer was made with "actual intent to hinder, delay, or defraud" a creditor. Adelphia Recovery Tr. v. Bank of Am., N.A., Nos. 05-cv-9050, 03-md-1529, 2011 WL 1419617, at *2 (S.D.N.Y. Apr. 7, 2011), aff'd sub nom. Adelphia Recovery Tr. v. Goldman, Sachs & Co., 748 F.3d 110 (2d Cir. 2014).

## A. Transfer of an Interest of the Debtor in Property

BLMIS had an interest in the transferred property at issue in this case.  SIPA provides that customer property transferred by the debtor and voidable under Section 548 of the Bankruptcy

Code "shall be deemed to have been the property of the debtor."
15 U.S.C. § 78fff-2(c)(3).  The defendants argue that the
Trustee failed to show a transfer of an interest of the debtor
in property because the IA Business was not part of the LLC.  As
discussed above, there is no dispute of material fact that the
IA Business was part of the LLC, and as such, the Trustee has
shown that there was a transfer of an interest in the property
of the debtor.  The Two-Year Transfers were transfers from BLMIS
to the defendants, and pursuant to SIPA, those were transfers of
an interest of the debtor.  See id.[5]

---

[5] In a similar case, Judge Furman recently found on cross motions for summary
judgment that the Trustee had standing to seek to recover Two-Year Transfers
as fraudulent transfers, and had established the elements of such a claim
with the exception of the element that the transfers were made by the LLC,
rather than by Bernard L. Madoff individually.  Picard  v. RAR Entrepreneurial
Fund, Ltd., No. 20-cv-1029, 2021 WL 827195 (S.D.N.Y. Mar. 3, 2021).  Judge
Furman concluded that there were issues of fact with respect to that issue
that could not be decided on a motion for summary judgment.  He pointed out
that, although two Bankruptcy Court decisions had squarely held that similar
transfers were made by the LLC, those decisions were rendered after trial.
See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC ("Bam II"), 624
B.R. 55 (Bankr. S.D.N.Y. 2020);  Sec. Inv. Prot. Corp. v. Bernard L. Madoff
Inv. Sec. LLC ("Nelson"), 610 B.R. 197 (Bankr. S.D.N.Y. 2019).

However, for the reasons explained above, there is no genuine issue of
material fact that the transfers in this case were in fact made by the LLC.
See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) ("[T]he mere
existence of some alleged factual dispute between the parties will not defeat
an otherwise properly supported motion for summary judgment; the requirement
is that there be no genuine issue of material fact.");  Meaders v. Helwaser,
831 F. App'x 595, 596 (2d Cir. 2020) ("To survive summary judgment, a
plaintiff cannot simply raise some metaphysical doubt as to the material
facts or present evidence that is merely colorable.");  Rosenbaum v. DataCom
Sys., Inc., No. 13-cv-5484, 2014 WL 572529, at *4 (S.D.N.Y. Feb. 13, 2014)
("A dispute about a material fact is genuine if the evidence is such that a
reasonable jury could return a verdict for the nonmoving [sic] party.").

Any contrary decision would be in tension with the finding that the Trustee
has standing to recover the transfers as property of BLMIS.  The conclusion
that the transfers were in fact made by the LLC is also consistent with the
conclusion of the bankruptcy court on a recent motion for summary judgment in
Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC ("Epstein"), No. 10-
4438, ECF No. 155 (Bankr. S.D.N.Y. Jan. 27, 2021).

### B. Two-Year Period

This action only seeks to recover the Two-Year Transfers, which were made within two years of the commencement of the SIPA liquidation.  The defendants have not contested the dates of the transfers from BLMIS to the defendants.  Accordingly, the Trustee has shown that the transfers he seeks to recover were within two years of the petition date.

### C. Fraudulent Intent

In this case, the transfer of property was made with actual intent to defraud.  It is well established that the Trustee is entitled to rely on a presumption of fraudulent intent when the debtor operated a Ponzi scheme.  See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC ("Cohen"), No. 08-1789, 2016 WL 1695296, at *5 (Bankr. S.D.N.Y. Apr. 25, 2016) (citing Omnibus Good Faith Decision, 531 B.R. at 471) ("[T]he Trustee is entitled to rely on the Ponzi scheme presumption pursuant to which all transfers are deemed to have been made with actual fraudulent intent."); In re Bernard L. Madoff Inv. Sec. LLC ("Cohmad Sec. Corp."), 454 B.R. 317, 330 (Bankr. S.D.N.Y. 2011) ("[T]he fraudulent intent on the part of the debtor/transferor . . . is established as a matter of law by virtue of the Ponzi scheme presumption . . . ."); see also Hayes v. Palm Seedlings Partners (In re Agric. Rsch. & Tech. Grp.), 916 F.2d 528, 535 (9th Cir. 1990) ("[T]he debtor's actual intent to hinder, delay

32

or defraud its creditors may be inferred from the mere existence of a Ponzi scheme."); Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC ("Bayou IV"), 439 B.R. 284, 305 (S.D.N.Y. 2010); Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.), 397 B.R. 1, 11 (S.D.N.Y. 2007).

There is no genuine dispute of material fact that BLMIS operated a Ponzi scheme. "The breadth and notoriety of the Madoff Ponzi scheme leave no basis for disputing the application of the Ponzi scheme presumption to the facts of this case, particularly in light of Madoff's criminal admission." In re Bernard L. Madoff Inv. Sec. LLC ("Chais"), 445 B.R. 206, 220 (Bankr. S.D.N.Y. 2011); see also Picard v. Katz, 462 B.R. 447, 453 (S.D.N.Y. 2011) ("[I]t is patent that all of Madoff Securities' transfers during the two-year period were made with actual intent to defraud present and future creditors . . . ."), abrogated on other grounds by Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, 513 B.R. 437 (S.D.N.Y. 2014). Courts considering similar issues consistently have found that BLMIS was a Ponzi scheme. See, e.g., Ida Fishman, 773 F.3d at 422; Epstein, No. 10-4438, ECF No. 155, at 5; Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC ("Greiff"), 476 B.R. 715, 718 (S.D.N.Y. 2012), aff'd, 773 F.3d 411 (2d Cir. 2014); Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re

Bernard L. Madoff Inv. Sec. LLC), 424 B.R. 122, 128-32 (Bankr.
S.D.N.Y. 2010), aff'd, 654 F.3d 229 (2d Cir. 2011).

In plea allocutions, Madoff and other BLMIS employees
explained that BLMIS operated as a Ponzi scheme, and such
allocutions "establish prima facie that Madoff ran BLMIS as a
Ponzi scheme." Legacy Capital Ltd., 603 B.R. at 691.  Courts
deciding issues in this liquidation have relied on such
allocutions.  See, e.g., Nelson, 610 B.R. at 209-10 ("Criminal
plea allocutions are admissible under the exceptions to the
hearsay rule set forth in FED. R. EVID. 803(22) for a judgment
of a previous conviction and FED. R. EVID. 807's residual
exception to hearsay."); Legacy Capital Ltd., 603 B.R. at 689-90
& n.8 (collecting cases) ("The Court may rely on a plea
allocution as evidence to support a fact.").

In determining the applicability of the Ponzi scheme
presumption, courts have considered whether (1) deposits were
made by investors; (2) the debtor conducted little or no
legitimate business; (3) the debtor produced little or no
profits or earnings; and (4) the source of payments to investors
was from cash infused by new investors.  Gowan v. Amaranth
Advisors L.L.C. (In re Dreier LLP), No. 08-15051, 2014 WL 47774,
at *9 (Bankr. S.D.N.Y. Jan. 3, 2014); Armstrong v. Collins, No.
01-cv-2437, 2010 WL 1141158 at *22 (S.D.N.Y. Mar. 24, 2010),
reconsideration denied, 2011 WL 308260 (S.D.N.Y. Jan. 31, 2011).

Other courts have concluded that, even without the Ponzi scheme presumption, transfers were made with actual intent to defraud where the scheme had badges of fraud, such as the absence of legitimate business in the investment program, unrealistic promises of low risk and high returns, commingling investor money, agents and brokers paid high commissions to perpetuate the scheme, misuse of investor funds, false financial statements, and excessively large fees.  See Gowan, 2014 WL 47774, at *9.  In this case, under both the four-factor test to show the existence of a Ponzi scheme or the badges of fraud analysis, it is plain the Two-Year Transfers were made with actual intent to defraud.

## 1. Four Factor Test

The first factor in the four-factor test is whether deposits were made by investors.  The defendants argue that they were not equity investors, but rather, they were creditors that had a contractual right to a certain rate of return.  However, the defendants' argument reads this factor too narrowly. Regardless of whether the defendants were creditors or equity investors, it is plain that they invested money with BLMIS with an expectation of a high return, and that return was obtained only by the use of fraud.  See Greiff, 476 B.R. at 726-27.

The second factor is whether the debtor conducted little or no legitimate business.  The defendants argue that only the

Proprietary Trading Business was part of the LLC, that the
Proprietary Trading Business was completely legitimate, and that
the IA Business also conducted legitimate business through the
purchase of T-Bills.  As described above, when Madoff filed the
Amended Form BD for BLMIS, all assets and liabilities of the
predecessor were transferred to the LLC, meaning that the IA
Business was part of the LLC.  Dubinsky provided a detailed
analysis explaining that the LLC included the IA Business.  The
defendants fail to raise a dispute of material fact with respect
to whether the IA Business was part of the LLC.

The defendants' argument that the IA Business conducted
significant legitimate business through the purchase of T-Bills
likewise fails.  Dubinsky's analysis demonstrated that no T-
Bills were purchased on behalf of IA Business customers.  The
defendants point to account statements provided to the
defendants that showed the Nissenbaum Account held T-Bills,
purchased by BLMIS on behalf of the defendants.  However, the
Dubinsky Report explains that BLMIS did use IA Business customer
money to purchase T-Bills, but not on behalf of IA Business
customers.  Rather, the T-Bills were purchased for BLMIS cash
management.  The defendants present no countervailing evidence,
but instead accuse Dubinsky of perjuring himself by selectively
quoting his trial testimony.  However, his testimony was
consistent with his report.

Dubinsky analyzed the T-Bills held by the Proprietary Trading Business and by the IA Business.  He compared the specific T-Bills allegedly held to the records at the DTC, which serves as the clearing house for treasuries, and he found that the unique security identifiers matched the T-Bills reportedly held for the Proprietary Trading Business, but that none of the T-Bills' unique security identifiers matched those purportedly held on behalf of IA Business customers.  Moreover, the amount of T-Bills actually held were considerably less than what BLMIS purportedly held on behalf of its IA Business customers.  For example, by the end of 2007, BLMIS actually held about $80 million in treasury positions through its Propriety Trading Business, but it purported to hold $57 billion in treasury positions for its IA Business customers.  Dubinsky also verified that the T-Bills BLMIS actually held did not match the trade date, volume, price, security description, and maturity date as those listed in IA Business customer account statements.  Through his analysis, he was able to conclude that the T-Bills listed on IA Business customer statements were fictitious.

The Dubinsky Report demonstrates that BLMIS purchased T-Bills with funds from the 703 Account for its own cash management, not for any particular IA Business customer.  DiPascali corroborated the Dubinsky Report in his criminal testimony.  The bankruptcy court found that "DiPascali's direct

37

testimony established that the T-Bill trades appearing on the customer statements were fabricated and bore no relationship to BLMIS's use of funds in the 703 Account to purchase T-Bills as a cash management tool. In other words, the actual T-Bill purchases were never allocated to the IA Business customers." Nelson, 610 B.R. at 228-29.

The defendants do not present any countervailing evidence. The defendants speculate that the T-Bills were held on behalf of the defendants, but the defendants do not produce any evidence disputing the Dubinsky Report or DiPascali's testimony, aside from questioning Dubinsky's credibility.

The defendants further argue that the Trustee is barred from arguing that BLMIS's holdings in T-Bills were insufficient to cover all of the IA Business customer accounts because the Trustee did not produce every account statement for each of the IA Business's customers. This argument has been rejected repeatedly, due to the volume of the documents involved. See, e.g., Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff), No. 08-01789, 2020 WL 1488399, at *19 (Bankr. S.D.N.Y. Mar. 20, 2020) (awarding fees and expenses against defense counsel personally because defense counsel "perpetuated the myth that the Trustee hid BLMIS's use of IA customer money to buy securities, when, in fact, this was fully disclosed in the Dubinsky Report, and then tried to leverage the

38

Trustee's perceived dishonesty plus his greater resources to force the Trustee to review 30 million documents in the BLMIS Database and the contents of 13,000 boxes"). There is no basis to find that the Trustee is barred from raising arguments concerning the analysis of IA Business customer statements. Therefore, there is no dispute of material fact that the IA Business did not conduct legitimate business by purchasing T-Bills on behalf of its customers.

Moreover, there is also no dispute of material fact that BLMIS did not legitimately trade equities for its IA Business customers. Madoff admitted under oath that he did not execute trades on behalf of his IA Business clients. DiPascali confirmed that BLMIS did not trade on behalf of the IA Business clients, and DiPascali created false account statements reflecting false transactions. According to his testimony, DiPascali used historical data to create false account statements showing lucrative trades posted to customer accounts, but those trades never occurred. Madoff would direct a specific rate of return for a client, and DiPascali would add fictious trade data to reflect that rate of return. Several other BLMIS employees also admitted to falsifying records and inflating revenue.

The Dubinsky Report provides clear evidence that BLMIS operated the IA Business as a Ponzi scheme. BLMIS represented

to its customers that it employed the split-strike conversion strategy, but it never did.  Dubinsky demonstrated that BLMIS never executed trades on behalf of its IA Business customers by records of fabricated trades, an impossible reported volume of equity trades, impossible equity and options trades recorded outside the daily price range, low volatility in performance compared to market behavior and the BLMIS Proprietary Trading Business performance, consistently positive rates of return that did not mirror the market, lack of DTC records to confirm equity trades, and a lack of OCC records to confirm options trades.

Accordingly, it is plain that BLMIS conducted little or no legitimate business for its IA Business customers.

The third factor is whether the IA Business was profitable. The defendants argue that because BLMIS profited between $700 and $800 million, the Ponzi scheme presumption is inapplicable. However, even if part of BLMIS engaged in legitimate business, it is common for a business to run a legitimate business alongside a Ponzi scheme, and the presence of a legitimate business alongside a Ponzi scheme does not undermine the Ponzi scheme presumption.  See, e.g., Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.), 310 B.R. 500, 506, 509-10 (Bankr. S.D.N.Y. 2002) (collecting cases); see also Scholes v. Lehmann, 56 F.3d 750, 757 (7th Cir. 1995) (Posner, J.) ("It is no answer that some or for that matter all of [the

debtor's] profit may have come from legitimate trades made by the corporations.  They were not legitimate.  The money used for the trades came from investors gulled by fraudulent representations.").  Therefore, the existence of BLMIS's legitimate Proprietary Trading Business and cash management does not vitiate the Ponzi scheme presumption.

The fourth factor is whether the source of payments to investors was from cash infused by new investors.  Despite the vast array of evidence the Trustee has presented, the defendants argue that there is no evidence that after-acquired funds were used to pay off previous investors.  The defendants offer no evidence for this position, but rather attempt unsuccessfully to undermine Dubinsky's credibility.  There is no genuine dispute of material fact that after-acquired funds were used to pay previous investors.

Therefore, based on an analysis of the four-factor test, it is plain that BLMIS operated as a Ponzi scheme.  Indeed, no rational jury could come to any other conclusion in view of Madoff's sworn admissions, DiPascali's testimony, Dubinsky's Report, and the supporting data.  Moreover, while the defendants argue that "it is conceivable that certain transfers may be so unrelated to a Ponzi scheme that the presumption should not apply," the Two-Year Transfers at issue in the BLMIS liquidation, as other courts have held, "served to further the

Ponzi scheme, and are therefore presumed fraudulent." In re
Bernard L. Madoff Inv. Sec. LLC, 458 B.R. 87, 105 (Bankr.
S.D.N.Y. 2011).  Accordingly, the Trustee is entitled to a
presumption that all transfers from BLMIS to the defendants in
the two years at issue were made with actual intent to defraud.

### 2. Badges of Fraud

Applying the badges of fraud analysis, it is equally plain
that the transfers in this case were made with actual intent to
defraud.  The Court of Appeals for the Second Circuit has long
recognized certain badges of fraud that indicate actual intent
to defraud, including inadequacy of consideration, close
relationship between parties, retention of use of the property
in question, the cumulative effect of a series of transactions,
the general chronology of the transactions, and concealment by
the transferor.  See Salomon v. Kaiser (In re Kaiser), 722 F.2d
1574, 1582-83 (2d Cir. 1983); see also In re Trib. Co.
Fraudulent Conv. Litig., No. 11-md-2296, 2017 WL 82391, at *13
(S.D.N.Y. Jan. 6, 2017).

In this case, BLMIS exhibited several badges of fraud.  The
Trustee has presented significant evidence that the IA Business
did not trade on behalf of its customers.  The IA Business did
not have significant influxes of cash or income apart from
customer funds.  Considering this very issue, the bankruptcy
court likewise concluded that the Two-Year Transfers had at

least three badges of fraud, namely: "(i) concealment of facts and false pretenses by the transferor, (ii) BLMIS's insolvency at the time of the Two-Year Transfers and (iii) the lack of consideration for the fictitious transfers." Nelson, 610 B.R. at 235. "[T]he existence of the badges of fraud supply a separate basis to conclude that the Two-Year Transfers were made with the actual intent to defraud." Id.

Accordingly, under both the four-factor test for the Ponzi scheme presumption and the badges of fraud analysis, the Two-Year Transfers were made with actual intent to defraud. Therefore, the Trustee has made a sufficient showing of his prima facie case pursuant to Section 548.

## VI.   Affirmative Defenses

The defendants argue that summary judgment should be granted dismissing the case because of affirmative defenses to the Trustee's claim.  They argue that the defendants gave value for each transfer and that Section 548(a)(1) is a statute of repose that precludes recovery in this case.  Both of those defenses fail as a matter of law.

### A. The Defendants Did Not Give Value

The defendants first argue that the Trustee's claim should be dismissed because the defendants paid value for each withdrawal.  In recovery actions, a transferee who takes for value and in good faith may retain any interest transferred to

43

the extent the transferee gave value to the debtor in exchange for the transfer.  11 U.S.C. § 548(c).  Because there is no dispute that the defendants acted in good faith, the issue is whether the defendants gave value for the Two-Year Transfers. "Value" in this context, is property or the securing or satisfaction of a debt, and a "debt" is defined as a liability on a claim.  Id. §§ 101(12), 548(d)(2).  A "claim" is a right to payment or a right to an equitable remedy for breach of performance, if it would give rise to a right to payment.  Id. § 101(5).  The defendants argue they gave value because the withdrawals were settlements of securities contracts and because the withdrawals are payments for contractual claims, namely the right of investors to be reimbursed for losses they suffered due to the wrongful actions of BLMIS.  The Court of Appeals for the Second Circuit recently addressed both of these arguments and concluded that investors similarly situated to the defendants in this case did not give value for the transfers.  See generally In re Bernard L. Madoff Inv. Sec. LLC ("Gettinger"), 976 F.3d 184 (2d Cir. 2020).

## 1. Settlement of Securities Contracts

The defendants cite Ida Fishman for the proposition that BLMIS's customers held a securities contract and argue that the payments to the defendants were settlement payments in response

to the defendants' request that BLMIS liquidate a portion of the securities in the Nissenbaum Account.  See 773 F.3d at 411, 418.

The Court of Appeals considered this argument and rejected it.  "[R]egardless of whether the [defendants] had securities entitlements as a result of the account statements, they did not have property rights to the values in excess of principal reflected there.  Accordingly, when BLMIS transferred those full values to the [defendants], the transfers were not in satisfaction of property rights and therefore were not for value."  Gettinger, 976 F.3d at 198; see also Bayou IV, 439 B.R. at 337 ("[V]irtually every court to address the question has held unflinchingly that to the extent that investors have received payments in excess of the amounts they have invested, those payments are voidable as fraudulent transfers."); Katz, 462 B.R. at 453-54 (transfers made by BLMIS to customers in excess of principal were not for value).  While the Court of Appeals had previously noted that the "broker's written crediting of securities to a customer's account creates an enforceable securities entitlement" in the context of whether those transfers were settlement payments within the safe harbor provision of Section 546(e), see Ida Fishman, 773 F.3d at 422-23, the defendants' argument "misreads [the court's] use of the phrase 'enforceable securities entitlement,' and mischaracterizes the context in which [the court] used it."

45

Gettinger, 976 F.3d at 196-97.  Therefore, the defendants'
argument that the Two-Year Transfers were for value because they
were settlement payments on a securities contract fails.

### 2. Payments of BLMIS's Liability on Contract Claims

The defendants also argue that the Two-Year Transfers were
for value because they were in satisfaction of potential claims
that could have been brought against BLMIS, such as breach of
contract and state tort law claims for fraud and breach of
fiduciary duty.  However, the Court of Appeals rejected this
argument and held that adopting the defendants' reasoning "would
conflict with SIPA's legally binding priority system."  Id. at
198.  SIPA prioritizes customers of BLMIS over its general
creditors and "incorporates the Bankruptcy Code to effectuate
its priority scheme . . . to the extent that it is consistent
with the provisions of SIPA."  Id. at 199.  Therefore, the
availability of the "for value" defense depends on "whether the
defense would operate in a manner consistent with SIPA and its
priority system."  Id. at 199.  The defendants' argument fails
because "recognizing the [defendants'] for value defense . . .
would place the [defendants], who have no net equity and thus
are not entitled to share in the customer property fund, ahead
of customers who have net equity claims.  SIPA does not permit
it."  Id.

"To the extent that defendants' state and federal law claims allow them to withhold funds beyond their net-equity share of customer property, those defendants are, in effect, making those damages claims against the customer property estate.  Because their damages claims are not net-equity claims (or any other payments that are permitted to be made in SIPA's priority scheme), allowing such claims to be drawn out of the customer property estate would violate SIPA."  Id. at 200 (quoting Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC ("In re BLMIS"), 499 B.R. 416, 424 (S.D.N.Y. 2013)).  Therefore, the defendants' argument that the Two-Year Transfers were for value as satisfaction of potential breach of contract or tort claims fails.

Accordingly, the Two-Year Transfers to the defendants were not for value.

### B. Statute of Repose

The defendants argue that Section 548(a)(1) is a statute of repose, limiting the Trustee's ability to recover liabilities on obligations from before the two-year time period.  "[I]n contrast to statutes of limitations, statutes of repose create a substantive right in those protected to be free from liability after a legislatively-determined period of time."  Police & Fire Ret. Sys. v. IndyMac MBS, Inc., 721 F.3d 95, 106 (2d Cir. 2013).  Unlike a statute of limitations, "a statute of repose may bar a

claim even before the plaintiff suffers injury, leaving [the plaintiff] without any remedy." Id.  Statutes of repose are not subject to equitable tolling.  Id.

The defendants argue that because Section 548(a) is a statute of repose, a trustee cannot avoid an obligation that arose more than two years before the filing.  The Nissenbaum Account statement for November 30, 2006 shows securities valued at $566,718.56.  Therefore, the defendants argue, the Trustee can only recover withdrawals taken in the final two years of BLMIS's operation to the extent they exceed the balance from the November 30, 2006 statement.

The Court of Appeals has considered this argument and rejected it.  "When the [defendants] and BLMIS entered into a securities contract, no right to the transfers at issue arose. The [defendants] had contracted for access to BLMIS's purported trading strategy and any profits that resulted from that strategy." Gettinger, 976 F.3d at 201.  The court further reasoned that "BLMIS never traded in securities and, as a result, never generated any legitimate profits.  The [defendants] therefore had no rights to the transfers let alone rights that arose prior to the two-year limitation period." Id. The defendants argue that the Trustee must avoid the BLMIS's obligation to pay the defendants before the Trustee can recover those transfers, and because the obligation arose more than two

years prior to the bankruptcy, the Trustee's recovery is barred
by the statute of repose.  However, that argument "is meritless
because no obligation exists for the trustee to avoid."  Id. at
201 n.10.

While Section 548(a) limits the Trustee's authority to
recover the Two-Year Transfers, Section 548(c), which allows a
good faith recipient of a fraudulent transfer who gives value to
the debtor to retain any interest transferred, does not contain
a similar limitation with respect to whether a transfer is given
"for value."  See id.; In re BLMIS, 499 B.R. at 427; see also 11
U.S.C. §§ 548(a), (c).  Therefore, the timing of the inter-
account transfers does not affect the relevant calculation in
this case.  Because the Trustee seeks only to recover fictitious
profits, not principal, the Trustee's claims "respect a line
between those transfers that were received for value and those
that were not."  Gettinger, 976 F.3d at 201.  The Trustee
calculated fictious profits using the "Net Investment Method,"
which netted the amount the defendants received from BLMIS
against the amount they had invested in BLMIS.  If the amount
the defendants received exceeded the amount they had invested,
the difference was considered fictious profits and was
recoverable to the extent that the money was transferred from
BLMIS to the defendants within the two years prior to BLMIS's
filing for bankruptcy.  "This method abides § 548(a)(1)'s

protection of transfers made more than two years prior to the filing of the bankruptcy petition while appropriately calculating harm or benefit to the estate, which is unrelated to a line drawn at a certain point in time for purposes of granting finality to ancient transactions." Id. at 202; see also Net Equity Decision, 654 F.3d at 239 ("[T]he Net Investment Method is consistent with the purpose and design of SIPA."). Accordingly, the Trustee's calculation of fictious profits is consistent with Sections 548(a) and (c).

## VII. Alleged Losses

The defendants argue that the Trustee cannot prove the alleged losses, and therefore, the Trustee's motion for summary judgment must be denied.  The defendants assert that the Trustee fails to credit the Nissenbaum Account with the full amounts transferred to it from other accounts starting in 1992 by Nissenbaum's relatives.  Therefore, the defendants argue, the Trustee's calculations violate the terms of SIPA that "[a]ccounts held by a customer in different capacities, as specified by these rules, shall be deemed to be accounts of 'separate' customers."  17 C.F.R. 300.100(b); see also 15 U.S.C. § 78fff-3(a)(2) ("[A] customer who holds accounts with the debtor in separate capacities shall be deemed to be a different customer in each capacity."); 15 U.S.C. § 78lll(11)(C) ("In determining net equity . . ., accounts held by a customer in

separate capacities shall be deemed to be accounts of separate customers.").  While the defendants contend that Greenblatt, the Trustee's expert, did not calculate the fictious profits properly, the defendants do not present any countervailing evidence or expert reports.

In calculating the alleged losses, the Trustee used the "Inter-Account Transfer Method."  The Court of Appeals has already approved of the Trustee's use of the Inter-Account Transfer Method:

> [T]he Inter-Account Method adopted by the Trustee does not . . . treat the transferor account and transferee account as one account in violation of SIPA.  The Inter-Account Method treats the two accounts as separate for purposes of determining "net equity" based on cash deposits and cash withdrawals, the only relevant data points under our Net Equity Decision. The Inter-Account Method also credits the transferee account with the value of actual principal investment (but not fictitious profits thereon) that the transferor account had to transfer, because it is axiomatic that one can transfer that which one has, here the amount of actual principal investment left in the transferor account, but cannot transfer that which one does not have, here the fictitious profits reflected in the transferor's BLMIS account statement.

Matter of Bernard L. Madoff Inv. Sec., LLC, 697 F. App'x 708, 711 (2d Cir. 2017).

In this case, as described in Mr. Greenblatt's expert report, the Trustee used the Inter-Account Transfer Method.  The Trustee produced sufficient data to prove the alleged losses attributable to the Nissenbaum Account, and the defendants have not submitted any countervailing evidence.  Accordingly, the

Trustee has proved the purported losses from the Two-Year
Transfers to the defendants.

## VIII.  Prejudgment Interest

The Trustee has sought prejudgment interest from the date
the Trustee filed the complaint against the defendants on
November 12, 2010—over ten years ago.  "[F]ull compensation to
the estate for the avoided transfer[s] normally requires
prejudgment interest to compensate for the value over time of
the amounts recovered."  In re Cassandra Grp., 338 B.R. 583, 599
(Bankr. S.D.N.Y. 2006).  Prejudgment interest has been awarded
against several similarly situated defendants in this SIPA
liquidation.  See, e.g., Lowrey, 2018 WL 1442312, at *15, report
and recommendation adopted, 596 B.R. 451 (S.D.N.Y. 2019), aff'd,
976 F.3d 184 (2d Cir. 2020); Nelson, 610 B.R. at 238.  The
defendants have not seriously contested the propriety of
prejudgment interest, and the Trustee "has spent time and
incurred costs litigating against Defendants who have resisted
the law of the case."  Bam II, 624 B.R. at 64.[6]  Accordingly, the
Trustee is entitled to prejudgment interest from the date of the
filing of this complaint, November 12, 2010, until the date
judgment is entered.

---

[6] The defendants do not make any arguments regarding prejudgment interest in
their briefs, but in a supplemental letter, they assert that prejudgment
interest would be "cruel" and should be "at the interest rate the Trustee
earned on funds deposited in a bank because that represents his true loss of
funds."  ECF No. 42, at 6.

Different interest rates have been used by different courts in this SIPA liquidation, compare Nelson, Nos. 10-4377, 10-4658 (Bankr. S.D.N.Y. Dec. 9, 2019), ECF Nos. 203, 205 (9%), with Bam II, 624 B.R. at 66 (4%), and Epstein, No. 10-4438, ECF No. 155, at 9 (4%).  The parties have not briefed the issue of what prejudgment interest rate should be applied in this case, but the Court awards prejudgment interest at a rate of 4%.

Pursuant to the law in this Circuit, "the award should be a function of (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." Wickham Contracting Co., Inc. v. Local Union No. 3, Intern. Broth. of Elec. Workers, AFL-CIO, 955 F.2d 831, 833-34 (2d Cir. 1992). Judgments based on both federal and state law apply the federal interest rate to prejudgment interest calculations.  Thomas v. iStar Financial, Inc., 629 F.3d 276, 280 (2d Cir. 2010).  "Where the interest rate codified in 28 U.S.C. § 1961 is too low to compensate the plaintiff, courts can opt to apply the prime rate of interest." In re FKF 3, LLC, No. 13-cv-3601, 2018 WL 5292131, at *13 (S.D.N.Y. Oct. 24, 2018).[7]  As other courts considering

---

[7] While 28 U.S.C. § 1961 specifies the rate of federal post-judgment interest, it has also been used in some cases for a rate of federal pre-judgment interest.  See Goldman Sachs Execution & Clearing, L.P. v. Off. Unsecured Creditors' Comm. of Bayou Grp., LLC, 491 F. App'x 201, 206 (2d Cir. 2012)

this issue have found, the federal interest rate would be less than 1%[8] and "[a]warding the prime rate of interest more fully compensates the Trustee and is the more appropriate rate." Bam II, 624 B.R. at 65.  The 4% interest rate represents the prime rate on December 15, 2008, the date of the protective decree beginning the BLMIS SIPA liquidation.  See id. (applying 4% interest rate); Epstein, No. 10-4438, ECF No. 155, at 9 (same). The 4% rate compensates the Trustee for the loss of the use of the Two-Year Transfers for the years that this litigation has lasted, and reduces the profits to the defendants from having withheld the funds.

Accordingly, the Court awards prejudgment interest at a rate of 4%, from the date this action was filed, November 12, 2010, until the date judgment is entered.

## CONCLUSION

The Court has considered all of the arguments raised by the parties.  To the extent not specifically addressed, the arguments are either moot or without merit.  For the reasons discussed, the Trustee's motion for summary judgment is **granted**

---

("We have recognized that while there is no federal statute that purports to control the rate of prejudgment interest, the post-judgment rate set forth in Section 1961 may be suitable for an award of prejudgment interest depending on the circumstances of the individual case."); see also Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc., 67 F.3d 1063, 1071 (2d Cir. 1995) ("The decision whether to grant prejudgment interest and the rate used if such interest is granted are matters confided to the district court's broad discretion . . . .").

[8] The federal interest rate pursuant to 28 U.S.C. § 1961 is the rate on the one-year constant maturity Treasury yield for the relevant period.  28 U.S.C. § 1961.

and the defendants' motion for summary judgment is **denied**. The Trustee is entitled to judgment in the amount of $625,551. The Trustee is also entitled to prejudgment interest at a rate or 4%, from November 12, 2010 through the date of entry of judgment. The Clerk is directed to enter judgment accordingly. The Clerk is also directed to close all pending motions and to close this case.

**SO ORDERED.**

Dated:    New York, New York
          March 24, 2021            _____/s/ John G. Koeltl_____
                                         **John G. Koeltl**
                                **United States District Judge**